# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA APPLEWHITE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 6860 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| CAROLYN W. COLVIN[1], Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Patricia Applewhite seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Ms. Applewhite asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Ms. Applewhite applied for DIB on October 21, 2008, alleging that she had become disabled on January 15, 2008, due to hypertension, diabetes, neuropathy, high cholesterol, and anxiety disorder. (Administrative Record ("R.") 167-71, 191). Her application was denied initially and upon reconsideration (R. 102-03, 106-10, 112-15), and Ms. Applewhite continued pursuit of her claim by filing a timely request for a hearing. An administrative law judge ("ALJ") convened a hearing at

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

which Ms. Applewhite, represented by counsel, appeared and testified. In addition, Dr. Freeman testified as a medical expert and Thomas Dunleavy testified as a vocational expert. (R. 42-101). On February 7, 2011, the ALJ issued a decision finding that Ms. Applewhite was not disabled because she could perform her past sedentary work as a receptionist. (R. 25-41). The ALJ's decision then became the final decision of the Commissioner when the Appeals Council denied Ms. Applewhite's request for review of on April 30, 2012. (R. 5-10). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Applewhite has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. Applewhite was born on December 10, 1955, making her fifty-five years old at the time of the ALJ's decision. (R. 250). She has completed two years of community college. (R. 199). Her past work has been generally sedentary or light, and did not require her to lift or carry much weight. (R. 202-205). Most recently, Ms. Applewhite worked as an immunization service coordinator for about 12 years. (R. 192, 201).

### B.
### The Medical Evidence

Ms. Applewhite points to just few pieces of medical evidence to support her claim for DIB, focusing on reports from a doctor who examined her twice and a doctor who examined her once. (Dkt. # 17, at 2-3). There's not much in the record beyond that. Ms. Applewhite went to the Roseland Neighborhood Health Center in June 2008 to refill her medications. She reported she had

2

lost her job. She had no complaints. Examination was normal aside from her blood pressure, which was elevated at 186/126. She weighed 289 pounds and stood just 5'3". (R. 366). This was just six months after she claims she became disabled and unable to do any work.

She returned for medication refills in February 2009. She had missed her December appointment. (R. 358). She again had no complaints and examination was normal. (R. 358-59). Her next appointment was scheduled for May. (R. 359).

The disability agency arranged for Ms. Applewhite to have a consultative examination with Dr. M. S. Patil on March 2, 2009. (R. 369-72). Ms. Applewhite told Dr. Patil that she was diagnosed with diabetes mellitus in 2007, and was taking Lantus for it. She said her accu-check readings were usually within normal limits. She claimed to have lost about 20 pounds during the previous year. She had no complaints of polyuria, chronic infections, or blurry vision. She did have intermittent mild burning sensation in her feet and sometimes had nagging pain in her legs – she was told it could be neuropathy. Ms. Applewhite added that experience a mild pain in her legs if she walked more than 2-3 blocks or stood for more than 15-20 minutes. She said she had had hypertension for the previous six years, but had never been hospitalized for stroke or heart attack. She claimed to get short of breath if she walked more than three blocks or went up and down stairs. She denied headaches, dizziness, dyspnea at rest, palpitations, or chest pain. (R. 369).

Dr. Patil found that Ms. Applewhite was 63 inches tall and weighed 281 pounds. Her blood pressure was 136/94. She was in no acute distress. Her gait was normal. Her vision, with correction, was 20/25 in each eye. Respiratory examination was normal, as was cardiac examination. Mental status examination showed that Ms. Applewhite's orientation, memory, appearance, and ability to relate during the examination were all entirely within normal limits. (R. 370).

3

Musculoskeletal examination and the neurological examination showed all normal findings. There was a full range of motion in all joints was noted and motor strength was 5/5 in all extremities. There was no sign of muscle wasting or paralysis. Ms. Applewhite's gait was normal, and she was able to walk 50 feet normally without and aiding device.

Dr. Patil's diagnostic impressions included chronic primary hypertension, and he found Ms. Applewhite's diastolic blood pressure was mildly elevated, but she was in no acute cardiopulmonary distress. There was no evidence of congestive heart failure, cerebral vascular accident, PTE, DVT or malignant arrhythmia's. His diagnostic impression also included diabetes mellitus but he noted no chronic foot ulcers, gangrene, or localized neurovascular deficits. Ms. Applewhite had been on oral hypoglycemic and insulin since 2007, but her history was negative for seizures, coma, ophthalmic, or amputation surgery. Dr. Patil found she was extremely obese, but it did not affect her gait or dexterity. Her range of motion was normal, and there was swelling, tenderness, or redness of any joint. (R. 371). Although there was a reported history of anxiety disorder, Dr. Patil found Ms. Applewhite's mental status normal. She denied any past inpatient psychiatric care, and she was not on psychotropic medications. (R. 372).

On March 4, 2009, Dr. Francis Vincent reviewed the medical record on behalf of the disability agency. (R. 373-80). He felt Ms. Applewhite could frequently lift 10 pounds, occasionally lift 20 pounds, stand or walk for 6 hours in and 8-hour workday, and sit for 6 hours as well. (R. 374). She could occasionally climb stairs or ramps, but never climb ropes or scaffolds. (R. 375). That same day, Kirk Boyenga, Ph.D., reviewed the filed and found there was no severe mental impairment present. (R. 381, 393). These findings were later confirmed by two additional reviewers in June 2009. (R. 395-97).

On November 5, 2009, Ms. Applewhite sought medication refills at Provident Hospital. (R. 410-12). She had no chest pain or shortness of breath. Her blood pressure was 140/97. Her lungs were clear to auscultation bilaterally. (R. 410). She was alert and oriented times 3. (R. 410, 412). Ms. Applewhite returned on February 25, 2010. (R. 405-06). She needed a disability form filled out and complained of insomnia, muscle spasm, back pain, and feeling sad most of the time. She was not taking her Metformin due to side effects. The doctor listed her problems as: hypertension, diabetes mellitus, hyperlipidemia, chronic sinusitis, tobacco use disorder, and chronic low back pain. Her medications were Metformin and Lantus. Dr. Tinfang's notes state that Ms. Applewhite was alert, morbidly obese, in no apparent distress, and cooperative. (R. 405). Range of lumbar motion was limited by pain, but straight leg raising was negative and strength was normal in all extremities. Dr. Tinfang prescribed Fluoxetine(Prozac) for depression. She told Ms. Applewhite to take her Metformin with food to avoid side effects. She told her to avoid fatty foods, recommended healthy weight habits and counseled her to stop smoking. (R. 406).

That same day, February 25th, Dr. Tinfang filled out a form provided by Ms. Applewhite's attorney. He reported that he had seen her just twice, and noted complaints of back pain and depressive mood. She checked "constantly" in response to how often Ms. Applewhite's symptoms would affect her concentration. She noted that Ms. Applewhite complained that one of her medications, Metformin upset her stomach. Dr. Tinfang checked "yes" in response to whether his patient would have to lie down more than three times in a work day. He said she could walk no more than ½ a block. She could sit for less than 30 minutes at a time and stand for no more than 10 minutes at a time. Yet, at the same time, she could sit for 8 hours "or less" in an 8-hour workday but not stand at all. She would have to take a 10-minute breaks every 15 to 20 minutes. (R. 509). She

could lift less than 10 pounds occasionally. She could use her hands/fingers/arms for only 2 hours a day. Dr. Tinfang wrote "depression" when asked whether anything else would affect Ms. Applewhite's ability to work a full-time job on a sustained basis. (R. 510).

Ms. Applewhite saw Dr. Tinfang again on May 27, 2010. She still had not filled her Fluoxetine prescription. Her son was in jail and she was sad and crying all the time. Dr. Tinfang found her to be in no apparent distress and cooperative. (R. 400). Ms. Applewhite denied having any problems with dizziness, or her vision. (R. 403). Blood pressure was 150/95. Dr. Tinfang discontinued Enalapril due to side effects, started Diovan, continued HCTZ and Nifedipine, gave Ms. Applewhite dietary recommendations. Her diabetes mellitus was well controlled on medication. Regarding her obesity, Dr. Tinfang recommended healthy weight habits. For neuropathic pain, the doctor prescribed a trial of Amitriptyline. She again counseled Ms. Applewhite to stop smoking. (R. 400-401).

Five months later, on October 28, 2010. Dr. Tinfang filled out the same form. This time she listed additional symptoms: shortness of breath, back spasms, shortness of breath on exertion (DOE). (R. 513). She reported that he had seen her just twice, and noted complaints of back pain and depressive mood. Diagnoses were diabetes, hypertension, obesity, back pain, and "depressed." The doctor noted that Ms. Applewhite complained that, Metformin, upset her stomach. (R. 513). The balance of the form was not filled out any differently than the prior time, with one exception. Dr. Tinfang, in response to how often Ms. Applewhite would have to miss work due to her impairments, wrote "unknow [sic]---->possibly" in the blank next to "More than four times a month." (R. 514).

6

## C.
## The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

Ms. Applewhite testified that she lived in an apartment with her adult son, his wife, and their son. (R. 50). She said she was let go from her last job due to her illness. (R. 51). But she also said she felt she was fired due to her age and she filed charges with the EEOC. (R. 51). The EEOC rejected her claims. (R. 51). Now, Ms. Applewhite said that she took care of a little girl three days a week for four hours a day. (R. 52). It was unclear what exactly she did to take care of the girl; seemingly she just sat and let her play. For that, the city paid her about $200 a month. (R. 52). Once, Ms. Applewhite had to go to the emergency room and was able to take the girl on the bus and pick her up to put her in a seat. (R. 96).

Ms. Applewhite said she was 5'3.5" and weighed 290 pounds. (R. 54). She admitted that she had been receiving unemployment insurance from 2008 – when she claims she became disabled – until March of 2010. (R. 55). She told the government that, during that time, she was able and willing to work. (R. 55). But, she said she didn't know what she could have done because she really couldn't do much of anything. (R. 55-56). She said she could barely sit and barely stand up. She did most of her housework sitting or standing because of back spasms. (R. 61). She gets short of breath. (R. 62). Ms. Applewhite claimed she didn't drive because she couldn't see. (R 64-65). She thought she needed a new prescription. (R. 65).

Ms. Applewhite couldn't do any cooking because she had spasms if she picked up a pot. (R. 67-68). The pain would last an hour. (R. 68). She was able to microwave prepared dishes. (R. 73). She claimed that she had been suffering with this since 2006. (R. 70). She did not clean because

7

she would get "sick." (R. 71). She couldn't sweep more than 20 minutes before she had to sit down. (R. 71). She had no hobbies; she just sat around and watched TV. (R. 72). She would spend a couple of hours in her recliner and the rest of the day she had to lie down in bed. (R. 83). Ms. Applewhite explained that the number one reason why she couldn't work was her back, the second was her blood pressure – she got dizzy. (R. 73).

### 2.
### The Medical Expert's Testimony

Dr. Julian Freedman testified as a medical expert. The doctor testified that the medical evidence supported diagnoses of morbid obesity, poorly-controlled hypertension, and relatively well-controlled diabetes. Asthma and diabetic neuropathy could not be diagnoses based on the files. (R. 88). There was some evidence of cardiac enlargement but not to the point of a diagnosis of congestive heart failure. (R. 89). Ms. Applewhite's condition did not meet a listed impairment. (R. 89). Dr. Freedman felt that, based on the medical evidence, Ms. Applewhite would be limited to sedentary work. She could only stand or walk two to four hours a day, sit six to eight hours a day, and lift no more than ten pounds. (R. 90). There was no evidence to suggest that her ability to manipulate was limited in any way. (R. 91).

### 2.
### The Vocational Expert's Testimony

Thomas Dunleavy then testified as a vocational expert. He said Ms. Applewhite's past work as immunization coordinator and receptionist-clerk, according to her testimony, was sedentary and skilled or semi-skilled, respectively. (R. 95, 98). Her child-care work was light work and semi-skilled. (R. 96). The ALJ asked Mr. Dunleavy to assume someone with Ms. Applewhite's vocational background and who was unable to lift more than ten pounds, stand or walk more than

8

two hours, sit as long as she could change positions, and could not climb ladders or scaffolds. (R. 97). Mr. Dunleavy testified that such an individual could perform work Ms. Applewhite's past except for child-care. (R. 97).

## D.
## The ALJ's Decision

The ALJ found that Ms. Applewhite suffered from the following severe impairments: morbid obesity, hypertension, diabetes mellitus, and congestive heart failure (isolated episodes). (R. 28). The ALJ noted that the record included some notes indicating that Ms. Applewhite was sad or crying, but there was no evidence of treatment. (R. 30). Her depression did not cause more than a minimal limitation on her ability to perform basic work activities. She had only mild limitations on activities of daily living, social functioning, and concentration. She has had no episodes of decompensation. (R. 31). The ALJ next determined that she did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 32).

The ALJ went on to determine that Ms. Applewhite had the residual functional capacity to perform a full range of sedentary work. (R. 34). The ALJ determined that Ms. Applewhite's credibility was limited. She said she didn't drive because she couldn't see, but her vision with her glasses was 20/25. (R. 35). The ALJ didn't buy the fact that Ms. Applewhite was being paid $13 an hour for child-care work when she said she did nothing more than sit in her home all afternoon with the child. (R. 35). She noted that Ms. Applewhite was able to take the child on a public bus ride, which indicated a certain degree of ability and mobility. (R. 35). There was very limited objective evidence of medical problems and no aggressive treatment. Ms. Applewhite used over-the-counter medication for pain. (R. 35). Some of Ms. Applewhite's claims were contradicted by the

9

medical evidence. At the hearing she said she was never able to walk very far due to dizziness; at her most recent doctor appointment, she denied experiencing any dizziness. (R. 35).

The ALJ gave limited weight to the reviewing physician's opinion that Ms. Applewhite could perform light work, since there was later evidence he could not review. She gave great weight to the psychologist's review of the record. (R. 35). She also gave great weigh to the medical expert's opinion that Ms. Applewhite could perform sedentary work – in fact she adopted it – as the medical expert had the benefit of the full record. (R. 35-36). Finally, the ALJ did not give significant weight to Dr. Tinfang's opinion. The doctor's treatment notes did not support her dire opinion of Ms. Applewhite's capacities. She had not treated Ms. Applewhite for very long. (R. 36). The ALJ then relied upon the testimony of the vocational expert that, given a capacity for sedentary work, Ms. Applewhite could perform her past work. (R. 36). Therefore, the ALJ determined she was not disabled and not entitled to disability insurance benefits.

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is not a difficult standard to meet; it is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to

whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALL's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALL's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). The Seventh Circuit also calls it a "lax" standard, *Berger*, 516 F.3d at 544.

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

11

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

Ms. Applewhite complains that the ALJ failed to consider her mental impairments in determining her residual functional capacity ("RFC"), and that her credibility assessment was flawed. She makes no other arguments and, as such, any she could have made are waived. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013); *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

### 1.

Ms. Applewhite's problem with the ALJ's RFC determination stems from her finding, at step two, that Ms. Applewhite's depression resulted in only mild limitations on her ability to perform daily activities, engage in social functioning, and maintain concentration. From this, the ALJ

concluded Ms. Applewhite's depression was not a severe impairment. Ms. Applewhite argues that the ALJ discuss these limitations in connection with her RFC determination.

Contrary to the Commissioner's brief (Dkt. # 18, at 5), an ALJ has to consider impairments she rules non-severe in her RFC determination. "After a 'not severe' finding at step two, the special technique requires the ALJ to assess the mental impairment in conjunction with the individual's RFC at step four." *Pepper v. Colvin*, 712 F.3d 351, 366 (7th Cir. 2013); *see also Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014); *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). And contrary to Ms. Applewhite's brief, the ALJ did not simply ignore her non-severe depression in making her RFC determination. The ALJ acknowledged that she was not allowed to conflate her step two analysis with her RFC determination (R. 31), and she clearly discussed the evidence regarding any mental impairment, from the consultative physician, the medical expert, and Dr. Tinfang. (R. 35-36).

In fact – again, contrary to Ms. Applewhite's brief – the ALJ specifically discussed Dr. Tinfang's opinion, but rejected it, mostly because it was unsupported by any treatment notes. (R. 36). Ms. Applewhite does not argue that the ALJ failed to accord proper weight to Dr. Tinfang's opinion, but where a physician's opinion is unsupported by her own treatment notes, that's a valid reason to discredit it. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). The first time Ms. Applewhite went to see Dr. Tinfang, on November 5, 2009, there was nothing wrong with her. She had no complaints. There was no mention of any depression. (R. 410-12). Ms. Applewhite sought no treatment for the next four months.

When she finally returned on February 25, 2009, Ms. Applewhite happened to have a disability checklist from her attorney, and she happened to have a number of complaints, including feeling sad and crying all the time. (R. 405). But Dr. Tinfang noted she was in no apparent distress,

13

and was alert, oriented, and cooperative. There was no mention of any problems with concentration. (R. 405-06). Yet, that same day, Dr. Tinfang filled out Ms. Applewhite's form and said Ms. Applewhite had been depressed for *several months* – again, there was no mention of depression the previous visit – and that her concentration was *constantly* affected. (R. 510). That's quite a leap from the treatment notes. The ALJ was well within her rights to reject Dr. Tinfang's opinion.[2]

And so, the ALJ rejected Dr. Tinfang's opinion and determined in her RFC analysis that any limitations from Ms. Applewhite's depression "were mild at best." (R. 36). The question remains, do those mild limitation have to be reflected in the RFC? In other words, having found that Ms. Applewhite has a mild limitation on her ability to concentrate, does that translate into a limitation that restricts her ability to perform sedentary work? Ms. Applewhite offers only a conclusory argument – unsupported by any citation to caselaw – that it must. (Dkt. # 17, at 7 n.7). Such arguments are ordinarily deemed waived, *see United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir.2011)("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"); *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir.2012). It should also be noted that the Seventh Circuit has specifically declined to rule on this issue as recently as 2012 – a point not noted by either side. *Guranovich v. Astrue*, 465 Fed.Appx. 541, 543 (7th Cir. 2012)

---

[2] Similarly, there is no indication in Dr. Tinfang's notes what might account for Ms. Applewhite's inability to use her hands for 3/4 of the day, or her need to take 10-minute breaks every 15-20 minutes, or lie down more than 3 times a day, etc. Straight leg raising was normal, as was strength in all Ms. Applewhite's extremities. (R. 406). The Seventh Circuit has noted that treating physicians – including those most likely to attract patients thinking of seeking disability benefits – will sometimes "bend over backwards to assist a patient in obtaining benefits." *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir.2006). The stark difference between Dr. Tinfang's notes and the way she filled out Ms. Applewhite's attorney's form certainly indicates that this bias was at work here – or at least the ALJ could have so concluded.

In any event, the regulations provide that, at step two, if the ALJ rates the degree of limitation in the first three categories as "none" or "mild" and "none" in the fourth area, the impairment is "not severe." 20 C.F.R. § 404.1520a(d)(1). A "non-severe" impairment is one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities," which include physical functions; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(a), (b). It is no more than a "slight abnormality." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). So, by definition, Ms. Applewhite's mild limitations did not have a significant effect on her ability to work. The ALJ clearly considered her mental impairment in his RFC analysis, but she concluded that the mild limitations that resulted were not significant enough to warrant the imposition of any additional non-exertional RFC limitations.

## 2.

Ms. Applewhite next complains that the ALJ's analysis of her credibility was flawed. An ALJ's credibility determination is entitled to deference, and a court may overturn a credibility finding only if it is "patently wrong." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Pepper*, 712 F.3d at 367. We are not allowed to reweigh the facts or reconsider the evidence. *Bates*, 736 F.3d at 1098; *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The court must uphold the ALJ's credibility determination if the ALJ provides specific reasons, supported by the record, for discrediting the claimant's testimony. *See Ronning v. Colvin*, – F.3d –, –, 2014 WL 593675, 3 (7th Cir. 2014)*; Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir.2012); *Myles v. Astrue,* 582 F.3d 672, 676 (7th Cir.2009). Here, the ALJ provided ample reasons for her disbelief of Ms. Applewhite's testimony, including

15

inconsistencies in her testimony, discrepancies between her testimony and the medical record, and lack of aggressive treatment for pain despite complains of disabling pain. (R. 35). Each of these reasons is an entirely valid basis for finding a claimant's testimony not credible. *See Bates*, 736 F.3d at 1098(inconsistencies in testimony); *Pepper*, 712 F.3d at 368-69(discrepancy between claimant's complaints and the medical evidence); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir.2005) ("discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration."); *Olsen v. Colvin*, – F.3d –, –, 2014 WL 185378, 6 (7th Cir. 2014)(conservative treatment); *Halsell v. Astrue*, 357 Fed.Appx. 717, 723 (7th Cir. 2009)(over-the-counter medication); *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009)("relatively conservative treatment").[3] As such, the ALJ's credibility determination cannot be said to be "patently wrong" and must be allowed to stand.

---

[3] At this point, out of an abundance of caution, it is perhaps necessary to note the following points even though they are not issues raised by Ms. Applewhite and are deemed waived. *See Schomas*, 732 F.3d at 707; *Skarbek*, 390 F.3d at 505. First, while the Seventh Circuit has ruled time and again that a claimant's credibility may be undermined by the objective medical evidence, *see, e.g., Pepper,* 712 F.3d at 368; *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005), the court has also ruled that an ALJ may not disregard a claimant's complaints of pain simply because they are not supported by the objective medical evidence. *See, e.g., Moore v. Colvin,* 743 F.3d 1118, 1125 (7th Cir. 2014); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). Perhaps these rulings might be harmonized by taking the court to mean that the ALJ can point to the medical record as undermining a claimant's testimony only when the ALJ provides additional reason for doubting it. Still, the court has seemingly upheld credibility determinations based solely on the objective medical evidence on a number of occasions. *See, e.g., Outlaw v. Astrue*, 412 Fed.Appx. 894, 896 (7th Cir. 2011); *Getch*, 539 F.3d at 483; *Adkins v. Astrue*, 226 Fed.Appx. 600, 606 (7th Cir. 2007); *Sienkiewicz*, 409 F.3d at 804. Regardless, in this instance, the ALJ's reasoning should be above reproach as she did not base her credibility analysis solely on medical evidence.

Second, when an ALJ wants to mention in her credibility analysis that a claimant has not sought treatment or has undergone only conservative treatment, it must be clear that the reason is not because of financial inability to obtain treatment. *See Pierce*, 739 F.3d at 1050. And so, ALJs are required to delve into the reasons for a lack of treatment in order to make that a part of their determination. *Id.*; *Thomas v. Colvin*, 534 Fed.Appx. 546, 552 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013). This cannot seriously be considered an issue here because the record demonstrates that, while Ms. Applewhite may have lost her insurance at some point, she had access to free, regular health care and prescription medications.

Ms. Applewhite does, however, have three specific critiques of the ALJ's reasoning. First, she finds fault with the ALJ's reference to her testimony that she no longer drove because she couldn't see. But, as the ALJ noted, Ms. Applewhite had her vision tested prior to the hearing during her consultative exam and it was found to be 20/25 in both eyes with her glasses. So, that is evidence of exaggeration, and a valid basis to discredit a claimant's testimony. *Pepper*, 712 F.3d at 368-69; *Lott v. Colvin*, 541 Fed.Appx. 702, 707 (7th Cir. 2013)(ALJ properly noted inconsistency between claimant's claims about eyesight at the hearing and eye doctor's report).

In her reply brief, Ms. Applewhite argues that her "corrected vision is not inconsistent with her testimony because she explained at the hearing that she has had the same glasses for years and they do not work." (Dkt. # 19, at 2). She did say that at the hearing but, nevertheless, when her vison was tested with those glasses at her consultative exam, it was 20/25. In Illinois, that is considered adequate vision for both day and night driving. http://www.cyberdriveillinois.com/departments/drivers/drivers_license/medical_vision.html. So, the glasses work well enough for her to drive.

Second, Ms. Applewhite also complains that the ALJ ought not to have found that her ability to care for her grandchildren undermined her credibility. (Dkt. #17, 19). First off, there is a problem with Ms. Applewhite's brief. According to Ms. Applewhite's testimony, she was caring for a little girl – not her granddaughter – and being paid to do so. (R. 52-53). So, she contradicts her own testimony in her argument. This is not a situation where Ms. Applewhite is caring for her child or her grandchild child because she has no choice. She is being paid to care for someone else's little girl. *Cf. Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005)(scolding ALJ for equating caring for

one's child with work in the labor force).[4]

One of the problems the ALJ had with Ms. Applewhite's testimony regarding her child care was that she contradicted herself. As the ALJ noted, Ms. Applewhite specifically testified that she was incapable of picking up a pot or a pan because her back would spasm for an hour. (R. 35, 67-68). Ms. Applewhite later undermined this testimony when she stated that she was able to pick up the two-year old child she was paid to care for when she took her on the bus. There was no mention of any hour-long spasm as a result. (R. 96). So, obviously – and again – she exaggerated when she testified that she was unable to pick up a pan without suffering dire consequences.

But it wasn't just the contradictions that bothered the ALJ. The ALJ just couldn't wrap her mind around the fact that Ms. Applewhite was being paid, by a government program, to take care of a very young child when, according to her, she could do nothing but sit in a recliner or lie in bed – and she could only manage two hours in the recliner. This extremely limited activity simply did not jibe with being compensated for taking care of a two-year-old and the ALJ understandably pointed that out. (R. 35).

Finally, Ms. Applewhite argues that the ALJ ought not to have noted her conflicting statements about her dizziness. Why not? It is yet another example of exaggerated testimony

---

[4] In *Gentle*, Judge Posner indicated that ALJs should never consider an individual's ability to care for their children as evidence they might be able to work. But still, caring for a two-year old is not akin to caring for a houseplant. Common sense and human experience—which always have a role to play, *United States v. Montoya De Hernandez,* 473 U.S. 531, 542 (1985); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir.1992) (Breyer, C.J.); *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir.2009); Posner, How Judges Think at 116 (Harv. Univ. Press 2008) – even in Social Security cases, *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010)--teach that caring for a two-year old is a more daunting physical task than many jobs. While it cannot be used as evidence of an ability to work, common sense dictates that, if a person is able to wrangle a toddler on a daily basis, her testimony that she is incapable of doing anything but sitting in a recliner or lying in bed may be evidence of a lack of candor, to say the least.

undermined by the record. As the ALJ noted, Ms. Applewhite testified that she is unable to walk very far at all because she is dizzy all the time. (R. 35). Ms. Applewhite claimed that she was dizzy whenever she got up, and she had been dizzy for a couple of years or longer. (R. 76). She also said she tells her doctors about it. (R. 76). But when Dr. Tinfang asked her if she got dizzy at her last visit before her hearing, she told her she didn't. (R. 403). In fact, Ms. Applewhite denied getting dizzy at her consultative exam in March 2009 as well. (R. 369). And there is no mention of complaints of dizziness in *any* of Dr. Tinfang's treatment notes. (R. 358, 405-06, 410). Ms. Applewhite claims she is dizzy whenever she stands up and tries to walk and that she tells her doctors about it, but the doctors' records say otherwise. It would be ridiculous if an ALJ could not take note of such a contradiction and question a claimant's credibility as a result.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [Dkt. #16] is DENIED, and the Commissioner's decision is AFFIRMED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 7/15/14